IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 4, 2019

IN RE BRYSON B. ET AL.

Appeal from the Juvenile Court for McMinn County
No. 2018-JV-813      Wylie Richardson, Judge

_____

No. E2019-00729-COA-R3-PT

_____

This is a termination of parental rights case involving four minor children. In October 2017, temporary custody of the children was granted to the Tennessee Department of Children's Services ("DCS"), and the children were placed in foster care. The McMinn County Juvenile Court ("trial court") subsequently adjudicated the children dependent and neglected in December 2017. DCS filed a petition to terminate the parental rights of the mother and father on December 7, 2018, alleging, as statutory grounds for termination, abandonment by failure to provide a suitable home, abandonment by failure to support, substantial noncompliance with the permanency plans, persistence of the conditions leading to the children's removal from the parents' home, and failure to assume custody or financial responsibility for the children.[1] Following a bench trial, the trial court granted the petition as to the mother upon finding that DCS had proven by clear and convincing evidence the grounds of (1) persistence of the conditions leading to removal, (2) substantial noncompliance with the permanency plans, and (3) failure to assume custody or financial responsibility for the children.[2] The trial court also found clear and convincing evidence that termination of the mother's parental rights was in the children's best interest. The mother has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

_____

[1] An additional ground of abandonment by an incarcerated parent was alleged regarding the father only.

[2] The trial court's termination order reflects that the father had surrendered his parental rights to the children at the beginning of the termination hearing and that the revocation period had passed before entry of the order. The father is not a party to this appeal.

James F. Mitchell, III, Athens, Tennessee, for the appellant, Britteny B.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.  Factual and Procedural Background

Britteny B. ("Mother") is the mother of four children:  Bryson B., born in 2007; Alexis B., born in 2009; Bentley B., born in 2010; and Madison B., born in 2014 (collectively, "the Children").  The trial court placed the Children in the custody of DCS on October 27, 2017, based upon allegations that they had been exposed to domestic violence in the parents' home and that the parents had failed to comply with requirements of a previously entered non-custodial permanency plan.  The Children were subsequently adjudicated dependent and neglected on December 12, 2017, based upon the parents' stipulation to the allegations contained in the petition for protective custody.

Also on December 12, 2017, the trial court ratified a permanency plan, which required Mother to complete, *inter alia*, the following requirements:

1.      obtain a mental health assessment, including a trauma assessment, and follow all recommendations;

2.      attend individual and family counseling to address mental health issues, domestic violence, anger, trauma, parenting, and relationships;

3.      take all medications as prescribed;

4.      sign appropriate releases to DCS to obtain necessary information;

5.      complete domestic violence classes and provide documentation;

6.      maintain stable housing;

7.      maintain adequate income;

8.      notify DCS of changes in circumstance including phone number, address, and composition of home;

9.    maintain visitation with the Children;

10.   refrain from subjecting the Children to domestic violence, whether verbal or physical;

11.   provide appropriate adult supervision for the Children; and

12.   attend all school meetings concerning Bryson and advocate for him.

On May 22, 2018, the trial court ratified a second permanency plan, which contained the above requirements as well as the additional requirements that Mother submit to random drug screens and undergo a drug and alcohol assessment and follow all recommendations therefrom. These additional requirements were the result of Mother's having tested positive for benzodiazepines and oxycodone in May 2018.

At a subsequent review hearing conducted on October 23, 2018, the Children's guardian *ad litem* expressed concern regarding the parents' visitation with the Children and made an oral motion to suspend the parents' visitation pending further hearing, which the trial court granted. On December 7, 2018, the trial court ratified a third permanency plan, which contained no significant additional requirements for the parents but had the added permanency goal of adoption.

Also on December 7, 2018, DCS filed a petition seeking termination of Mother's parental rights based upon the following statutory grounds: (1) abandonment by failure to provide a suitable home, (2) abandonment by failure to support, (3) persistence of the conditions leading to removal, (4) substantial noncompliance with the permanency plans, and (5) failure to assume custody or financial responsibility for the Children. DCS further asserted that termination of Mother's parental rights was in the Children's best interest.

The trial court conducted a bench trial concerning the petition for termination on March 15, 2019, and subsequently entered an order on April 2, 2019, terminating Mother's parental rights. In this order, the trial court noted that DCS's counsel had announced during the hearing that DCS would not pursue the ground of abandonment by failure to support. The court also found that DCS had not proven, by clear and convincing evidence, the ground of abandonment by failure to provide a suitable home. Regarding the remaining statutory grounds for termination, the trial court found that DCS had presented clear and convincing evidence concerning the grounds of (1) persistence of the conditions leading to removal, (2) substantial noncompliance with the permanency plans, and (3) failure to assume custody or financial responsibility for the Children. The court further found that termination of Mother's parental rights was in the Children's best interest. Mother timely appealed.

## II.  Issues Presented

Mother presents the following issues for our review, which we have restated slightly:

1. Whether the trial court erred by determining that DCS had established the statutory ground of persistence of the conditions leading to removal of the Children from Mother's home by clear and convincing evidence.

2. Whether the trial court erred by determining that DCS had established the statutory ground of substantial noncompliance with the permanency plans by clear and convincing evidence.

3. Whether the trial court erred by determining that DCS had established the statutory ground of failure to assume custody and financial responsibility for the Children by clear and convincing evidence.

4. Whether the trial court erred by determining that DCS had established that termination of Mother's parental rights was in the best interest of the Children by clear and convincing evidence.

## III.  Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not

absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

> * * *

> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). In addition, as our Supreme Court has explained, this Court is required "to review thoroughly the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 525.

## IV. Statutory Grounds for Termination

Tennessee Code Annotated § 36-1-113 (Supp. 2019) lists the statutory requirements for termination of parental rights, providing in relevant part:

> (a)    The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.
>
> * * *
>
> (c)    Termination of parental or guardianship rights must be based upon:
>
> > (1)    A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> >
> > (2)    That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of three statutory grounds to terminate Mother's parental rights: (1) persistence of the conditions leading to removal, (2) substantial noncompliance with the permanency plans, and (3) failure to assume custody or financial responsibility for the Children. We will address each statutory ground in turn.

### A. Persistence of Conditions

Mother asserts that the trial court erred by determining that the ground of persistence of the conditions leading to the Children's removal from Mother's home had been proven by clear and convincing evidence. Regarding this statutory ground,

Tennessee Code Annotated § 36-1-113(g)(3) provides:

(A)     The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

    (i)     The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

    (ii)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

    (iii)     The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

(B)     The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard.

In the instant action, the trial court adjudicated the Children dependent and neglected on December 12, 2017. Therefore, it is undisputed that the Children had been removed from Mother's custody and home by a court order for more than six months prior to the hearing on the termination petition. *See* Tenn. Code Ann. § 36-1-113(g)(3). The trial court removed the Children from Mother's home based upon allegations that the Children had been exposed to domestic violence in the parents' home and that the parents had failed to comply with the requirements of a previously entered non-custodial permanency plan. The pleadings reflect that this non-custodial permanency plan required the parents to (1) obtain a mental health assessment and follow all recommendations, (2) obtain domestic violence treatment, and (3) obtain marriage counseling.

With regard to this statutory ground, the trial court found:

The children were removed from the home, the physical custody, and the legal custody of the mother by order of this Court entered on October 26, 2017, the children were adjudicated as dependent and

- 7 -

neglected as to the mother on December 12, 2017, and the children have not returned to her care or custody at any time since then . . . . Although it appears that the mother has remedied the condition that led to the children's removal from her (namely, domestic violence), other conditions now exist that, in all reasonable probability, would cause the children to be subjected to further abuse or neglect if returned to the mother's care and custody. Specifically, the mother has tested positive for non-prescribed substances on urine drug screens on multiple occasions while the children have been in DCS custody (see Collective Exhibit 3 for documentation of the results of these urine drug screens). Also, based upon her own testimony as well as that of FSW [Family Services Worker] Bradley, the mother has failed to establish a stable home for the children at any time since the children entered DCS custody, and she has failed to secure a stable source of income with which to care for the children's needs.

There is little chance that those conditions will be remedied at an early date, so that the children can be returned to the mother in the near future. The children have been removed from the custody and care of the mother for 17 months during this most recent DCS custody episode, and three of the children (Bryson, Alexis, and Bentley) have been removed from the mother into DCS custody 2 times before, not to mention the numerous past non-custodial cases during which DCS has been involved with the family in Bradley County, Tennessee. All things considered, the mother has had the benefit of DCS services and support on many occasions during the children's lives, and yet she has failed to demonstrate a lasting change that would enable her to safely care for the children.

Moreover, the continuation of the parent/child relationship greatly diminishes the children's chances of early integration into a safe, stable, and permanent home. The Court heard testimony from the foster mothers for Bentley and Madison that they are able and willing to adopt those children if they become available for adoption. Although the testimony of FSW Bradley and Smoky Mountain Children's Home representatives Deb Landon and Jay Fischesser [concerning] Bryson and Alexis indicates that Bryson and Alexis are not currently in pre-adoptive placements, their testimony also demonstrates that contact with the mother has coincided with negative behaviors exhibited by those children in the past. The testimony of those witnesses also indicates that the children have been making progress to overcome their negative behaviors since being removed from the mother's care and custody, so that hopefully they, too, will be able to achieve permanency through adoption.

Following our thorough review of the record, we conclude that the trial court's findings are supported by a preponderance of the evidence. At trial, Mother acknowledged that the Children had been in DCS custody previously and on more than one occasion. Mother testified that she had separated from the Children's father ("Father") after the Children were removed and had recently contacted an attorney with the intent of beginning divorce proceedings. Mother had, therefore, theoretically resolved concerns related to ongoing domestic violence in her home, which was one of the primary reasons that the Children were placed into custody. Mother admitted that the Children had witnessed violent altercations between Father and her in the past, including instances wherein Father choked Mother and Mother hit Father with a baseball bat. Mother further admitted that Father had struck the Children and that she did not report this abuse to DCS at that time.

Although Mother had removed herself from her relationship with Father by the time of trial, Mother had since moved in with a boyfriend, Jamie S., with whom she had begun a relationship only six months prior to trial. Mother testified that she was unemployed but had recently applied for various jobs. Mother's most recent employment was in November 2018 and lasted approximately one week. According to Mother, Jamie S. was also unemployed and in the process of applying for disability. When questioned as to how the couple paid their bills, Mother replied that Jamie S.'s mother "helps us right now." Mother further testified that she had no means of transportation other than relying on friends or using her boyfriend's mother's car. Mother presented no record of stable employment and had only worked sporadic, temporary jobs during the time the Children had been in protective custody. As such, Mother had no means of supporting herself, much less the Children, and was completely dependent upon others for her housing and transportation needs.

In addition to the precarious nature of Mother's living situation, DCS presented evidence that Mother had been struggling with a substance abuse issue. The DCS Family Services Worker assigned to the Children, Sharmin Bradley, testified that Mother had failed three out of the five drug screens she had been administered since the Children had come into custody. The drug screen reports introduced at trial indicated that Mother had tested positive for benzodiazepines and oxycodone, with the most recent positive screen occurring in November 2018. Mother acknowledged that she had taken unprescribed controlled substances given to her by her cousin, although she claimed that she was no longer doing so at the time of trial. Mother stated that she had also undergone an alcohol and drug assessment and that she was currently taking only prescribed medication for Post-Traumatic Stress Disorder ("PTSD"), anxiety, and depression. As Ms. Bradley noted, however, Mother had not provided verification of her prescriptions so that Ms. Bradley could determine whether Mother was taking her medication as prescribed. Mother also acknowledged that a recommendation of her alcohol and drug assessment was individual counseling, which she had only recently begun.

Based on the evidence presented, although Mother had arguably resolved the most pressing concern that brought the Children into protective custody, that being the domestic violence situation involving Father, we conclude that other conditions existed that "in all reasonable probability, would cause the [Children] to be subjected to further abuse or neglect, preventing the [Children's] safe return to the care of" Mother. *See* Tenn. Code Ann. § 36-1-113(g)(3); *see also In re Quadavon H.*, No. E2015-02001-COA-R3-PT, 2016 WL 3453379, at *3 (Tenn. Ct. App. June 16, 2016) ("The focus is not solely on the conditions which led to the removal of the children but includes the consideration of whether other conditions exist which would prevent the children's return.").

We further conclude that there is little likelihood that these conditions could be remedied at an early date so that the Children could be returned to Mother and that continuation of the parent and child relationship greatly diminishes the Children's chances of "early integration into a safe, stable, and permanent home." *See id.* We accordingly conclude that the evidence preponderates in favor of the trial court's finding by clear and convincing evidence that conditions persisted that prevented the Children's safe return to the care of Mother.

### B. Substantial Noncompliance with Permanency Plans

Mother asserts that DCS failed to present clear and convincing evidence to support termination of her parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(2), which provides as an additional ground for termination of parental rights:

> There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]

To terminate parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(2), the parent's noncompliance with the permanency plan must be substantial. *See In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). Additionally, our Supreme Court has held that "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *Id.* This Court has explained the following regarding the ground of substantial noncompliance with the permanency plan:

> Mere noncompliance is not enough to terminate a parent's rights. *In re Valentine*, 79 S.W.3d [643,] 548 [(Tenn. Ct. App. 2004)]. Additionally, the unsatisfied requirement(s) must be important in the plan's scheme. *Id.* A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*,

140 S.W.3d [643,] 656 [(Tenn. Ct. App. 2004)] (citing *In re Valentine*, 79 S.W.3d at 548). Improvements in compliance are construed in favor of the parent. *In re Valentine*, 79 S.W.3d at 549 (citing *State Dept. of Human Servs. v. Defriece*, 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996)). Yet, we must determine compliance in light of the permanency plan's important goals:

> In our view, a permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives. We think that where return to parent is the goal, parents must complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis.

*In re V.L.J.,* No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014).

*In re Abbigail C.*, No. E2015-00964-COA-R3-PT, 2015 WL 6164956, at *20-21 (Tenn. Ct. App. Oct. 21, 2015).

In this matter, the trial court removed the Children from Mother's custody on October 27, 2017. The Children were subsequently adjudicated dependent and neglected on December 12, 2017, based upon the parents' stipulation to the allegations contained in the petition for protective custody. The trial court ratified a permanency plan that same day, which required Mother to complete, *inter alia*, the following requirements:

1. obtain a mental health assessment, including a trauma assessment, and follow all recommendations;

2. attend individual and family counseling to address mental health issues, domestic violence, anger, trauma, parenting, and relationships;

3. take all medications as prescribed;

4. sign appropriate releases to DCS to obtain necessary information;

5. complete domestic violence classes and provide documentation;

- 11 -

6.      maintain stable housing;

7.      maintain adequate income;

8.      notify DCS of changes in circumstance including phone number, address, and composition of home;

9.      maintain visitation with the Children;

10.     refrain from subjecting the Children to domestic violence, whether verbal or physical;

11.     provide appropriate adult supervision for the Children; and

12.     attend all school meetings concerning Bryson and advocate for him.

On May 22, 2018, the trial court ratified a second permanency plan, which contained the above requirements with the additional requirements that Mother submit to random drug screens and undergo a drug and alcohol assessment and follow all recommendations therefrom. Subsequently, on December 7, 2018, the trial court ratified a third permanency plan, which contained no significant additional requirements for the parents but had the added permanency goal of adoption.

Concerning Mother's progress regarding the requirements of the permanency plans, the trial court found as follows in pertinent part:

The mother is in substantial noncompliance with the requirements in the permanency plans. Although the mother has completed a mental health assessment, she has not followed all of the recommendations from that assessment. The mother has completed classes for domestic violence and parenting, but she has only done so recently. The mother has not complied with the majority of the most important requirements under the permanency plan, which are those related to her financial and residential instability that contributed to the removal of the children from her care and custody. Also important are the requirements related to alcohol & drug assessment and treatment, given the mother's problems with substance abuse that arose after removal and prevent the children's safe return to the mother; the mother is likewise noncompliant with these requirements. In addition, the mother has not complied with the requirement of family counseling, she has not kept in close contact with DCS regarding changes in her circumstances, and she has not been involved in educational meetings for Bryson. Overall, the mother's lackluster compliance with permanency plan requirements

shows this Court that she has not made the true life changes necessary to effectively parent the children.

The evidence adduced at trial supports these findings. Although Mother testified that she had fulfilled several of the requirements of the permanency plans, including completion of a mental health assessment, completion of an alcohol and drug assessment, completion of parenting and domestic violence classes, and beginning individual counseling sessions, Ms. Bradley testified that most of these accomplishments had occurred very recently, following the filing of the termination petition. Mother acknowledged that her progress on the plans was "kind of late," explaining that she had completed parenting classes the prior week and begun counseling within the most recent month. As the trial court stated in its ruling from the bench, Mother was "just barely getting off the ground" after the Children had been in protective custody for seventeen months.

As this Court has previously explained, "a parent's efforts to comply with a permanency plan after the filing of a petition to terminate can be 'too little, too late.'" *See In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *6 (Tenn. Ct. App. Apr. 4, 2018) (*quoting In re A.W.*, 114 S.W.3d 541, 546-47 (Tenn. Ct. App. 2003) (determining that termination on the ground of substantial noncompliance with a permanency plan was appropriate although the mother had completed some of the permanency plan requirements but not until after the termination petition was filed)). Furthermore, as the trial court found, Mother had not complied with the major permanency plan requirements related to her financial and residential instability. Mother had not maintained stable housing and was dependent upon the assistance of others to support her current housing. Additionally, Mother had neither a source of income nor prospects for steady income at the time of trial. Although Mother had recently begun individual counseling, she had never participated in family counseling, had not proven that she was taking her medications as prescribed, had failed to maintain consistent contact with DCS, and had failed to attend school meetings regarding Bryson.

Mother had maintained visitation with the Children, although not with great regularity, prior to having her visitation rights suspended in October 2018. The visits including Mother were described as "chaotic" by the service workers involved because the Children were loud, rambunctious, and would not listen to the parents. One worker also testified that the parents seemed more interested in interacting with the service workers than in taking care of the Children. Since the time that visitation was suspended, Mother had maintained no contact with the Children and had little contact with their caregivers. Although Mother conceded that she knew she needed to "work her plan" in order to have her visitation rights reinstated, she had largely failed to make progress regarding her plan requirements until after the filing of the termination petition.

We determine that the progress made by Mother toward the permanency plans' requirements, while commendable, does not rise to the level of substantial compliance. Mother did not demonstrate progress sufficient to "achieve the goal of permanency in [the Children's] lives" or show that she was "willing and able to resume caring for [the Children] in the long-term." *See In re Abbigail C.*, 2015 WL 6164956, at *21. We therefore conclude that the evidence preponderates in favor of the trial court's finding by clear and convincing evidence that Mother had not substantially complied with the requirements of her permanency plans.

### C. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility of the Child

Mother contends that DCS failed to present clear and convincing evidence to support termination of her parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(14), which provides as an additional ground for termination:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

In the instant action, the trial court found as follows regarding this statutory ground:

> The mother has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody of the children. Despite DCS'[s] reasonable and diligent efforts to assist the mother in regaining custody, to which the mother readily admitted in her testimony, the mother has achieved only perfunctory compliance with permanency plan requirements, rather than the type of lasting life changes that are necessary for her to regain custody of the children. The mother has also failed to manifest, by act or omission, an ability and willingness to personally assume financial responsibility for the children. The mother's testimony establishes that she has worked only 6 days in the past 17 months, and she presented no proof of having any non-employment sources of income with which to provide for the children's needs.
>
> Based on these circumstances, placing the children in the mother's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children. Bentley and Madison are well-bonded in loving foster homes with foster parents who wish to adopt

them if they become available for adoption. Although Bryson and Alexis are not currently in pre-adoptive homes, they are doing well in their current placements, and all 4 children are making progress towards overcoming negative issues that have plagued them throughout their young lives. For her part, the mother has not addressed the negative issues in her own life that caused the children's removal, nor does she have a safe and stable home to offer the children. It would therefore be very harmful to the children's psychological welfare—and possibly their physical welfare, too—if they were placed back with the mother at this point in their lives.

This Court has recently explained the following with regard to this ground for termination of parental rights:

> Essentially, this ground requires DCS to prove two elements by clear and convincing evidence. First, DCS must prove that [the parent] failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). DCS must then prove that placing the children in [the parent's] "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." *Id.*
>
> * * *
>
> We have made the following observations about what constitutes "substantial harm":
>
>> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.
>
> *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

*In re Maya R.*, 2018 WL 1629930, at *7-8 (additional internal citations omitted).

- 15 -

This Court has also previously held that the first prong of Tennessee Code Annotated § 36-1-113(g)(14) requires that the petitioner prove that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child. *See In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018); *but see In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018) (reversing this ground for termination when parents were unable but willing to assume custody and financial responsibility of their children). A parent's actions can demonstrate a lack of willingness to assume custody of or financial responsibility for the Child. *See In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018); *In re Amynn K.*, 2018 WL 3058280, at *15.

Regarding the first prong in the instant action, the trial court found that DCS had proven by clear and convincing evidence that Mother had not manifested an ability and willingness to personally assume legal and physical custody of the Children or financial responsibility for the Children. Although Mother described Ms. Bradley as "awesome," stating that Ms. Bradley had always been responsive and helpful, Mother had not found or maintained steady employment and had no income at the time of trial. There was no proof presented that Mother was physically or mentally unable to maintain employment. Furthermore, Mother had resided in at least five different places during the seventeen months between when the Children were placed into custody and the time of trial, and she had most recently been residing with a boyfriend who also had no income, with the couple dependent on the boyfriend's mother for payment of their living expenses. Based on the foregoing, we agree with the trial court's determination by clear and convincing evidence that Mother was not able and willing to assume physical or legal custody of or financial responsibility for the Children, as demonstrated by her actions.

The second prong of this statutory ground requires DCS to prove by clear and convincing evidence that placing the Children in Mother's legal and physical custody would pose a risk of substantial harm to the Children's physical and psychological welfare. In addition to Mother's recreational use of medications that were not prescribed for her, Mother had not kept consistent contact with the Children or their caregivers. The evidence demonstrated that some of the Children acted out after visits with Mother and expressed anxiety before such visits. Furthermore, the Children had been residing in stable foster placements, although separate, in order to obtain the help that each child needed. Two of the Children were in potential pre-adoptive placements. By the time of trial, Mother had not seen the Children in several months due to her lack of progress concerning the permanency plan requirements as well as her behavior and that of the Children during prior visits. Notably, testimony indicated that Mother had been

uncooperative concerning visitation and had cursed and yelled at one worker when she was told that she could not walk the Children to the vehicle at the end of a visit.

Based on the foregoing, the trial court found that DCS also had met its burden regarding this prong. Upon careful review of the record, we agree. The evidence does not preponderate against the trial court's finding that placing the Children into Mother's custody would pose a risk of substantial harm to the Children's physical and psychological welfare. Accordingly, we affirm the trial court's determination by clear and convincing evidence regarding this statutory ground for termination of Mother's parental rights.

## V. Best Interest of the Children

Mother contends that the trial court erred by finding that termination of her parental rights was in the best interest of the Children. We disagree. When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("'The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.'" (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) (Supp. 2019) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

- 17 -

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court has explained regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d at 254.

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor

relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d at 555 (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the instant action, as relevant to the first four factors listed above, the evidence demonstrated that termination of Mother's parental rights was in the Children's best

interest. Mother had failed to make a sufficient adjustment of her circumstances such that it would be safe for the Children to be in her home. Despite reasonable efforts by DCS, Mother had not maintained steady employment, stable housing, or sobriety for a sufficient duration of time to demonstrate a lasting adjustment. Although Mother had maintained somewhat regular visitation with the Children prior to suspension of her visitation rights, she had not fulfilled the requirements necessary to regain those rights and thus had not visited with the Children for a number of months prior to trial. As such, there was no testimony concerning whether Mother maintained a meaningful relationship with the Children.

Concerning factor five, DCS demonstrated that a change of caretakers would have a detrimental effect on the Children. Two of the Children were in stable, potentially pre-adoptive homes. The other two Children were in placements that allowed them to receive the services they required. The evidence demonstrated that the Children had significant needs when they came into DCS custody and were receiving necessary therapy for anger, violent outbursts, and other unhealthy behaviors. Even the youngest child, who was three years old when DCS took custody, could barely talk and was not potty-trained at that time. The evidence established that the Children were doing well in their placements and had shown improvement with their various issues. In addition, DCS had ensured that the children still participated in sibling visits despite the suspension of the parents' visitation.

Concerning factor six, Mother had shown neglect of the Children while they resided in her home, and she acknowledged that Father had been abusive to the Children, a fact she did not report at that time. Little evidence was presented with regard to Mother's current physical home in accordance with factor seven, except that it was newly established and was not large enough to accommodate the Children. Factor eight addresses Mother's mental and emotional stability. There was also little evidence concerning this factor except that Mother had recently begun counseling and suffered from PTSD, depression, and anxiety. However, Mother's seemingly cavalier attitude regarding the urgency of the Children's situation and her permanency plan requirements indicates that she lacked the ability to appreciate the Children's needs or to appropriately meet those needs. Finally, Mother presented no evidence that she had ever paid child support.

The trial court properly considered the statutory best interest factors in determining that those factors weighed against preserving Mother's parental rights to the Children. Based on our thorough review in light of the statutory factors, we conclude that the evidence presented does not preponderate against the trial court's determination by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children. Having also determined that statutory grounds for termination were established by the same quantum of proof, we affirm the trial court's termination of Mother's parental rights.

## VI.  Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights and collection of costs assessed below.  Costs on appeal are assessed to the appellant, Britteny B.

_____
THOMAS R. FRIERSON, II, JUDGE